☑ Original ☐ Duplicate Original

# UNITED STATES DISTRICT COURT
### for the
Eastern District of Wisconsin

| | |
|---|---|
| In the Matter of the Search of | ) |
| *(Briefly describe the property to be searched* | ) |
| *or identify the person by name and address)* | )    Case No. 24-841M(NJ) |
| records and information associated with Target Phone | )    **Matter No.: 2023R00308** |
| 1: (773) 426-3316, Target Phone 2: (616) 329-5328, | ) |
| whose service provider is T-Mobile; See Attachments | ) |

## WARRANT BY TELEPHONE OR OTHER RELIABLE ELECTRONIC MEANS

To:    Any authorized law enforcement officer

     An application by a federal law enforcement officer or an attorney for the government requests the search and seizure of the following person or property located in the _____ District of _____
*(identify the person or describe the property to be searched and give its location)*:

   See Attachment A. This Court has jurisdiction pursuant to 18 U.S.C. §§ 2703 and 2711 and Federal Rule of Criminal Procedure 41.

     I find that the affidavit(s), or any recorded testimony, establish probable cause to search and seize the person or property described above, and that such search will reveal *(identify the person or describe the property to be seized)*:

   See Attachment B.

     **YOU ARE COMMANDED** to execute this warrant on or before 4/10/2024 _____ *(not to exceed 14 days)*
☑ in the daytime 6:00 a.m. to 10:00 p.m.    ☐ at any time in the day or night because good cause has been established.

     Unless delayed notice is authorized below, you must give a copy of the warrant and a receipt for the property taken to the person from whom, or from whose premises, the property was taken, or leave the copy and receipt at the place where the property was taken.

     The officer executing this warrant, or an officer present during the execution of the warrant, must prepare an inventory as required by law and promptly return this warrant and inventory to _____ Hon. Nancy Joseph _____.
                                                          *(United States Magistrate Judge)*

     ☐ Pursuant to 18 U.S.C. § 3103a(b), I find that immediate notification may have an adverse result listed in 18 U.S.C. § 2705 (except for delay of trial), and authorize the officer executing this warrant to delay notice to the person who, or whose property, will be searched or seized *(check the appropriate box)*
     ☐ for _____ days *(not to exceed 30)*    ☐ until, the facts justifying, the later specific date of _____.

Date and time issued: 3/27/2024 @ 2:18 p.m. _____

                                                *Judge's signature*

City and state:    Milwaukee, WI _____    Hon. Nancy Joseph, U.S. Magistrate Judge
                                                              *Printed name and title*

**Return**

| Case No.: | Date and time warrant executed: | Copy of warrant and inventory left with: |
|---|---|---|
| | | |

Inventory made in the presence of :

Inventory of the property taken and name(s) of any person(s) seized:

**Certification**

      I declare under penalty of perjury that this inventory is correct and was returned along with the original warrant to the designated judge.

Date: _____

_____
*Executing officer's signature*

_____
*Printed name and title*

## ATTACHMENT A

### Property to Be Searched

Records and information associated with the following cellular devices assigned call numbers (referred to herein and in Attachment B as the "Target Cell Phone"): **Target Phone 1: (773) 426-3316, Target Phone 2: (616) 329-5328**, whose service provider is T-Mobile, a wireless telephone service provider headquartered in Parsippany, NJ.

## ATTACHMENT B

### Particular Things to be Seized

**I.      Information to be Disclosed by the Provider**

To the extent that the information described in Attachment A is within the possession, custody, or control of the Provider, including any information that has been deleted but is still available to the Provider or that has been preserved pursuant to a request made under 18 U.S.C. § 2703(f), the Provider is required to disclose to the government the following information pertaining to the Account listed in Attachment A:

a.      The following subscriber and historical information about the customers or subscribers associated with the **Target Phone 1**, and **Target Phone 2** for the time period October 1, 2020, to the present:

    i.      Names (including subscriber names, usernames, and screen names);

    ii.      Addresses (including mailing addresses, residential addresses, business addresses, and e-mail addresses);

    iii.      Local and long-distance telephone connection records;

    iv.      Records of session times and durations, and the temporarily assigned network addresses (such as Internet Protocol ("IP") addresses) associated with those sessions;

    v.      Length of service (including start date) and types of service utilized;

    vi.      Telephone or instrument numbers (including MAC addresses, Electronic Serial Numbers ("ESN"), Mobile Electronic Identity Numbers ("MEIN"), Mobile Equipment Identifier ("MEID"); Mobile Identification Number ("MIN"), Subscriber Identity Modules ("SIM"), Mobile Subscriber

Integrated Services Digital Network Number ("MSISDN"); International Mobile Subscriber Identity Identifiers ("IMSI"), or International Mobile Equipment Identities ("IMEI");

vii. Other subscriber numbers or identities (including the registration Internet Protocol ("IP") address); and

viii. Means and source of payment for such service (including any credit card or bank account number) and billing records; and

ix. All records and other information (not including the contents of communications) relating to wire and electronic communications sent or received by Target Cell Phone 1 for the period of January 1, 2022, to the present including:

    a. the date and time of the communication, the method of the communication, and the source and destination of the communication (such as the source and destination telephone numbers (call detail records), email addresses, and IP addresses); and

    b. information regarding the cell tower and antenna face (also known as "sectors" through which the communications were sent and received) as well as per-call measurement data (also known as "real-time tool" or "RTT").

b. Information associated with each communication to and from Target Cell Phone 1 and 2, for a period of 30 days from the date of this warrant, including:

i. Any unique identifiers associated with the cellular device, including ESN, MEIN, MSISDN, IMSI, SIM, or MIN;

2

ii.      Source and destination telephone numbers;

iii.     Date, time, and duration of communication; and

iv.      All data about the cell towers (i.e. antenna towers covering specific geographic areas) and sectors (i.e. faces of the towers) to which Target Cell Phone 1 will connect at the beginning and end of each communication as well as per-call measurement data (also known as "real-time tool" or "RTT").

c.      Information about the location of Target Cell Phone 1 and 2 for a period of 30 days during all times of day and night. "Information about the location of the Target Phone" includes all available E-911 Phase II data, GPS data, latitude-longitude data, and other precise location information.

i.      To the extent that the information described in the previous paragraph (hereinafter, "Location Information") is within the possession, custody, or control of the Provider, the Provider is required to disclose the Location Information to the government. In addition, the Provider must furnish the government all information, facilities, and technical assistance necessary to accomplish the collection of the Location Information unobtrusively and with a minimum of interference with the Provider's services, including by initiating a signal to determine the location of Target Cell Phone 1 on the Provider's network or with such other reference points as may be reasonably available, and at such intervals and times directed by the government. The government shall compensate the Provider for reasonable expenses incurred in furnishing such facilities or assistance.

3

ii. This warrant does not authorize the seizure of any tangible property. In approving this warrant, the Court finds reasonable necessity for the seizure of the Location Information. *See* 18 U.S.C. § 3103a(b)(2).

## II. Information to be Seized by the Government

All information described above in Section I that will assist in the investigation of Torion R. BROOKS, and others regarding violations of 18 U.S.C. § 922(a)(1)(A) (engaging in a firearms business without a license); 18 U.S.C. § 922(g)(1) (unlawful possession of firearms and ammunition); 18 U.S.C. § 922(d)(10) (sale of a firearm to a person who intends to use it for a felony or a drug trafficking crime); 18 U.S.C. § 933 (trafficking firearms); 18 U.S.C. § 924(c) (possession of a firearm in furtherance of crime of violence or drug trafficking crime); 18 U.S. Code § 1029 (Fraud and related activity in connection with access devices); 18 U.S. Code § 1028A (Aggravated identity theft); 18 U.S.C. § 371 (conspiracy); 18 U.S.C. § 1341 (mail fraud); and 21 U.S.C. 841 (illegal drug distribution), are being committed or will be committed by Torion R. BROOKS, Nichole BROOKS, Jermaine C. NASH and others.

Law enforcement personnel (who may include, in addition to law enforcement officers and agents, attorneys for the government, attorney support staff, agency personnel assisting the government in this investigation, and outside technical experts under government control) are authorized to review the records produced by the Provider to locate the things particularly described in these Warrants.

4

# UNITED STATES DISTRICT COURT

for the

Eastern District of Wisconsin

| | | |
|---|---|---|
| In the Matter of the Search of | ) | |
| *(Briefly describe the property to be searched or identify the person by name and address)* | ) ) | Case No. 24-841M(NJ) |
| records and information associated with Target Phone 1: (773) 426-3316, Target Phone 2: (616) 329-5328, whose service provider is T-Mobile; See Attachments | ) ) ) ) | **Matter No.: 2023R00308** |

## APPLICATION FOR A WARRANT BY TELEPHONE OR OTHER RELIABLE ELECTRONIC MEANS

I, a federal law enforcement officer or an attorney for the government, request a search warrant and state under penalty of perjury that I have reason to believe that on the following person or property *(identify the person or describe the property to be searched and give its location)*:

See Attachment A. This Court has jurisdiction pursuant to 18 U.S.C. §§ 2703 and 2711 and Federal Rule of Criminal Procedure 41.

located in the _____ District of _____ , there is now concealed *(identify the person or describe the property to be seized)*:

See Attachment B.

The basis for the search under Fed. R. Crim. P. 41(c) is *(check one or more)*:

☑ evidence of a crime;

☐ contraband, fruits of crime, or other items illegally possessed;

☑ property designed for use, intended for use, or used in committing a crime;

☐ a person to be arrested or a person who is unlawfully restrained.

The search is related to a violation of:

| Code Section | Offense Description |
|---|---|
| 18 U.S.C. § 922(a)(1)(A); 922 (g)(1); 922(d)(10); 933; 924(c); 371; 1341; | Engaging in a firearms business without a license; unlawful possession of firearms and ammunition; sale of a firearm to a person who intends to use it for a felony or a drug trafficking crime; trafficking firearms; conspiracy; mail fraud; |

The application is based on these facts:

See attached Affidavit.

☑ Continued on the attached sheet.

☐ Delayed notice of _____ days *(give exact ending date if more than 30 days:* _____ *)* is requested under 18 U.S.C. § 3103a, the basis of which is set forth on the attached sheet.

GABRIEL LOWRANCE  Digitally signed by GABRIEL LOWRANCE
Date: 2024.03.26 10:05:21 -05'00'

*Applicant's signature*

SA Gabe Lowrance, ATF

*Printed name and title*

Attested to by the applicant in accordance with the requirements of Fed. R. Crim. P. 4.1 by telephone _____ *(specify reliable electronic means)*.

Date: 3/27/2024

*Judge's signature*

City and state:  Milwaukee, WI

Hon. Nancy Joseph, U.S. Magistrate Judge

*Printed name and title*

## AFFIDAVIT IN SUPPORT OF AN APPLICATION
## FOR A SEARCH WARRANT
### Matter No.: 2023R00308

I, Gabriel Lowrance, being first duly sworn, hereby depose and state as follows:

### <u>INTRODUCTION AND AGENT BACKGROUND</u>

1.      I make this affidavit in support of an application for search warrant under Federal Rule of Criminal Procedure 41 and 18 U.S.C. §§ 2703(c)(1)(A) for information about the location of the cellular telephones assigned call numbers as follows: **Target Phone 1: (773) 426-3316** and **Target Phone 2**: **(616) 329-5328** whose service provided is T-Mobile, a wireless telephone service provider headquartered in Parsippany, NJ.

2.      Based on the facts set forth in this affidavit, there is probable cause to believe that violations of 18 U.S.C. § 922(a)(1)(A) (engaging in a firearms business without a license); 18 U.S.C. § 922(g)(1) (unlawful possession of firearms and ammunition); 18 U.S.C. § 922(d)(10) (sale of a firearm to a person who intends to use it for a felony or a drug trafficking crime); 18 U.S.C. § 933 (trafficking firearms); 18 U.S.C. § 924(c) (possession of a firearm in furtherance of crime of violence or drug trafficking crime); 18 U.S. Code § 1029  (Fraud and related activity in connection with access devices); 18 U.S. Code § 1028A (Aggravated identity theft); 18 U.S.C. § 371 (conspiracy); 18 U.S.C. § 1341 (mail fraud); and 21 U.S.C. 841 (illegal drug distribution), are being committed or will be committed by Torion R. BROOKS, Nichole BROOKS, Jermaine C. NASH and others.

3.      The Court has jurisdiction to issue the proposed warrants because it is a "court of competent jurisdiction" as defined in 18 U.S.C. § 2711.  Specifically, the Court is a district court of the United States that has jurisdiction over the offenses being investigated; *see* 18 U.S.C. § 2711(3)(A)(i).

4. Because these warrants seek the prospective collection of information, including cell-site location information, that may fall with the statutory definitions of information collected by a "pen register" and/or "trap and trace device," *see* 18 U.S.C. § 3127(3) & (4), the requested warrant is designed to also comply with the Pen Register Act. *See* 18 U.S.C. §§ 3121-3127. The requested warrants therefore include all the information required to be included in an order pursuant to that statute. *See* 18 U.S.C. § 3123(b)(1).

5. I am employed as a Special Agent with the United States Department of Justice, Bureau of Alcohol, Tobacco, Firearms and Explosives ("ATF") assigned to the Milwaukee Field Office since January 2020. I have been employed as a full-time law enforcement officer for approximately fifteen years. Prior to employment with ATF, I served as a police officer with the Robinson Police Department in Illinois and the Lake Havasu City Police Department in Lake Havasu City, Arizona.

6. As a Special Agent, I have participated in the investigation of firearms and narcotics-related offenses, resulting in the prosecution and conviction of numerous individuals and the seizure of illegal drugs, and weapons. As a firearms investigator, I have interviewed many individuals involved in firearm and drug trafficking and have obtained information from them regarding acquisition, sale, importation, manufacture, and distribution of firearms and controlled substances. Through my training and experience, I am familiar with the actions, habits, traits, methods, and terminology utilized by the traffickers and abusers of controlled substances.

7. Based on my training, experience and participation in drug trafficking and firearms trafficking investigations, I know and have observed the following:

Case 2:24-mj-00841-NJ     Filed 03/27/24     Page 10 of 57     Document 1

8.     I have relied on informants to investigate firearms trafficking and drug trafficking. Through informant interviews and debriefings of individuals involved in those offenses, I have learned about the way individuals and organizations finance, purchase, transport, and distribute firearms and narcotics both within and outside of Wisconsin. I have utilized informants to conduct "controlled purchases" of firearms and controlled substances from individuals, as opposed to licensed gun dealers. I have also conducted surveillance of individuals engaged in firearms and drug trafficking and participated in the execution of numerous search warrants resulting in the seizure of drugs, firearms, ammunition, and magazines.

9.     Based on my training and experience, I have become familiar with the language utilized over the telephone to discuss firearms and drug trafficking and know that the language is often limited, guarded, and coded. I also know that firearms and drug traffickers often use electronic devices (such as computers and cellular phones) and social media to facilitate these crimes.  Based on my experience, I know that firearms traffickers may keep photographs of these items on electronic devices.

10.     I also know that drug traffickers and firearms traffickers commonly possess—on their person, at their residences, at their places of business, in their vehicles, and other locations where they exercise dominion and control—firearms, ammunition, and records or receipts pertaining to such.

11.     I know that firearms traffickers and drug traffickers often put their telephones in nominee names to distance themselves from telephones that are utilized to facilitate these and related offenses. I also know that firearm and drug traffickers often use proceeds to purchase assets such as vehicles, property, jewelry, and narcotics. I also know that firearm and drug

3

traffickers often use nominees to purchase or title these assets to avoid scrutiny from law enforcement.

12.     The facts in this affidavit come from my personal observations, my training and experience, and information obtained from other investigators and witnesses. This affidavit is intended to show merely that there is sufficient probable cause for the requested warrant and does not set forth all my knowledge about this matter.

## **PROBABLE CAUSE**

13.     On August 24, 2023, your affiant initiated a case related to a complaint made to the Milwaukee Police Department by CBC Industries, a business located in North Charleston, South Carolina.  CBC Industries is a manufacturer of firearms and firearms accessories sold online via their website.

14.     The complaint from CBC industries concerned approximately 29 attempted and two completed online purchases of AR-15 firearm parts, totaling approximately $35,000 of AR-15 upper receivers and other AR-15 accessories. The purchases were made from CBC's website using stolen credit card information, and orders used the name Torion R. BROOKS and telephone numbers associated to Torion BROOKS.

15.     The purchases occurred between July 27, 2023, and August 8, 2023. The fraudulent purchases were flagged because the billing addresses varied from the delivery addresses.   CBC records showed billing addresses from approximately fourteen different states and shipping addresses at the following locations: 1526A W. Congress, Milwaukee, WI; 4710 N. 30th St, Milwaukee, WI; and 3219 N 46th St, Milwaukee, WI.

16.     In two purchases, CBC Industries communicated with the user of the email address, billyj1730@gmail.com. On July 24, 2023, CBC Industries requested a front and back

4

photo of identification to verify the purchaser's identity. The user of billyj1730@gmail.com sent a front and back photo of an Arizona driver's license for Torion R. BROOKS ("TORION"). Your affiant reviewed the criminal history of TORION. TORION has a misdemeanor conviction in Cook County, IL Circuit Court on January 11, 2023, for Unlawful Use of a Weapon. TORION was sentenced to two years of probation. Your affiant located an Illinois driver's license with an address of 4747 S Dr. Martin Luther King Jr Dr, #2005, Chicago, IL.

17. Two purchases were delivered to addresses in Milwaukee, WI. The first transaction was an order of six AR-15 upper receivers. The order was placed on or about July 24, 2023, and totaled approximately $990. The order was shipped by CBC industries via Federal Express to TORION at 1526A W. Congress, Milwaukee, WI, and were delivered and signed for by "HTBROOKS" on July 31, 2023.

18. The second order from CBC Industries was placed on or about August 18, 2023. Five items of AR-15 parts and accessories, totaling approximately $1,170.00. The parts were delivered to TORION at 3219 N 46th St, Milwaukee, WI. The order consisted of AR-15 bolt carrier groups and charging handles, and an AR-15 pistol kit. The AR-15 pistol kits from CBC Industries include parts for an AR-15 pistol but does not include the lower receiver. Your affiant knows through training and experience that when an AR-15 upper receiver components are paired with an AR-15 lower receiver, the items may readily be converted to a working firearm.

**THE NARCOTICS ACTIVITIE OF CORTEZ BROOKS**

19. Your affiant reviewed a jail call which occurred on January 11, 2023, by Cortez BROOKS, who is currently incarcerated at Fox Lake, WI Correctional Institution ("CORTEZ"). CORTEZ was identified as the uncle of TORION. CORTEZ called TORION at 872-243-4797 (Hereinafter "TORION PHONE 1") TORION stated he is in an airport and is on his way to

Houston to go grab that "drank." Your affiant knows "drank" to be a term to reference a drink containing promethazine syrup and codeine. Both individuals discussed "bars" and "percs". Your affiant knows these terms to be prescription opioid pills. TORION stated he knows an individual who will travel to pharmacies in small towns for "percs." CORTEZ inquired about suboxone strips. Your affiant knows suboxone strips to be prescription opioids in strip form. CORTEZ and TORION discussed how to obtain opioids and who to sell them to. Additionally, both CORTEZ and TORION discussed "dog". Your affiant knows "dog" to be a term to mean heroin. TORION said he had previously taken an individual a sample. CORTEZ and TORION discussed prices for "dog" and who they can sell it to. CORTEZ said he does not want TORION engaged in physical narcotics sales and wants others to do it on their behalf.

20.　　On July 29, 2023, CORTEZ called TORION. CORTEZ and TORION discussed suspected methamphetamine trafficking. CORTEZ wished TORION still had the ice connect. Your affiant knows "ice" to be a term for methamphetamine. Your affiant knows the term "connect" is a term for source of narcotics. TORION said he would attempt phone calls to obtain more information. CORTEZ asked TORION about an individual identified as "Rocko." I believe "Rocko" to be Jermaine C. NASH. TORION said he had previously traveled hours aways for "Rocko" to obtain items. I believe TORION to have transported narcotics for "Rocko." TORION described the travel destination as being hours away. CORTEZ asked if TORION knew "Rocko's" "plug." Your affiant knows "plug" to be a term for a source of narcotics.

21.　　On September 5, 2023, CORTEZ and TORION participated in a video visit. When the visit began, TORION was on screen. TORION displayed an item that appeared to be a cigar. CORTEZ advised TORION to keep the "weed off the screen" when TORION would

6

show the cigar. This leads me to conclude that TORION was smoking cannabis. TORION stated he was at the "crib" while smoking in NICHOLE's car. Your affiant knows NICHOLE to be Nichole R. BROOKS "NICHOLE") the wife of CORTEZ and the aunt of TORION. Your affiant knows "crib" to be a term for a residence. TORION said he was getting things "going out here." CORTEZ advised TORION to focus on "Fat Man." CORTEZ described TORION's location as a "gold mine" and described the area as less things to worry about. TORION said he has only been in the area for a few days.

22. Your affiant believes "Fat Man" to be Rashod BETHANY ("BETHANY"). Your affiant reviewed the criminal history of BETHANY. BETHANY was found to have convictions on April 21, 2004, in Cook County IL Circuit Court for possession of controlled substance (Felony) and possession of cannabis (misdemeanor). BETHANY has a felony conviction in United States District Court Northern District of Illinois Eastern Division for conspiracy to possess controlled substance. BETHANY is a known documented Gangster Disciple (GD) gang member. BETHANY is also documented as previously being the leader of a group of gang members known to sell narcotics in the "Trigger Town" area on the south side of Chicago, IL.

**FIREARM ACTIVITIES**

23. During the aforementioned call on July 29, 2023, TORION stated he is building guns and has learned how to build the AR-15 rifles. TORION spoke about other firearms he was building and described them as little ones and real small, leading me to suspect he could also be speaking about AR-15 pistols. Your affiant knows TORION ordered AR-15 pistol kits from CBC Industries. TORION described the firearms as ghost guns and described them as a size to fit under a shirt. CORTEZ asked TORION if TORION is making the firearms. TORION explained making them and obtaining the parts via the internet. TORION stated he was looking

7

to stock up. TORION advised if he decides to sell them, TORION will sell them for $1,500 and the firearms do not cost him more than $300-$400. TORION explained he was looking to stock up. TORION has been spending his time putting firearms together, leading me to believe he is discussing converting AR-15 receivers into fully functioning firearms and stockpiling inventory to be released to the public.

24.     CORTEZ asked if the firearms are five inches. TORION stated the firearms are the same size as a micro draco and shoot 7.62 and 5.56 and the same bullet as an "AK." Your affiant knows "micro draco" to be an AK-47 pistol. Your affiant knows 7.62 and 5.56 to be calibers of ammunition that can be fired by an AR-15. Your affiant also knows TORION to have ordered or attempted to order 5" AR-15 pistol kits from CBC Industries.

25.     Your affiant is aware the term "ghost gun" describes a privately made firearm (PMF) that has no serial numbers. These PMFs have become sought after by those engaged in criminal activity because they are easily obtained, and difficult for law enforcement to trace back to a specific possessor or purchaser.

**NICHOLE BROOKS**

26.     Y Your affiant identified a female as NICHOLE, the wife of CORTEZ. Through the review of jail calls and previously obtained ping data, TORION is known to travel through the states of Wisconsin, Illinois, Minnesota, Indiana, and Iowa. TORION is known to travel with NICHOLE. NICHOLE allows TORION use of her vehicle. (Herein after SUBJECT VEHICLE 1) Agents observed TORION driving SUBJECT VEHICLE 1 with NICHOLE as a passenger.

27.     TORION traveled to Albert Lea, MN, during the months of October, November, December of 2023, and January of 2024 and stayed for extended periods with NICHOLE. Ping data for TORION PHONE 1 indicated the device to be in the area in and around Albert Lea, MN.

8

During that time TORION placed phone calls to phone number 920-808-1280, known to be the phone of NICHOLE. NICHOLE has also been present with NICHOLE in the areas of Albert Lea, MN, Fox Lake, WI; Milwaukee, WI; Merrillville, IN; and Chicago, IL, observed by agents through surveillance, cellular data, and review of jail phone calls.

28. On September 20, 2023, SUBJECT VEHICLE 1 was stopped by the Minnesota State Patrol. The traffic stop occurred in Austin, MN on Interstate 90 near exit #179. TORION was the driver of SUBJECT VEHICLE 1 and NICHOLE was the passenger. NICHOLE identified herself as the owner of the vehicle and TORION was identified as NICHOLE'S "nephew." TORION identified himself with an Illinois driver's license. The Minnesota State Patrol report did not indicate an address for TORION. TORION and NICHOLE were traveling from Fox Lake Correctional Institution. TORION and NICHOLE had visited CORTEZ. TORION was issued a warning for speeding and released.

29. On September 21, 2023, CORTEZ called TORION. TORION admitted he was pulled over. TORION described NICHOLE as antsy during the stop.

30. Also on September 21, 2023, CORTEZ contacted NICHOLE. NICHOLE and CORTEZ discussed being pulled over. CORTEZ and NICHOLE argued over issues with NICHOLE'S vehicle, use of the vehicle, and TORION being pulled over. NICHOLE expressed fears of losing her vehicle and being sentenced to penitentiary time. This leads your affiant to believe the travel by NICHOLE and TORION was involving the trafficking of illegal items and could result in arrest and the possible seizure of SUBJECT VEHICLE 1.

31. On October 23, 2023, CORTEZ placed a phone call to TORION. CORTEZ asked TORION when TORION would be returning to Milwaukee. On October 23, 2023, CORTEZ again contacted TORION. NICHOLE was present during the call. CORTEZ and NICHOLE

9

argued throughout the call. CORTEZ suggested TORION could drive for NICHOLE. TORION expressed an intent to travel by train.

32. On October 26, 2023, agents conducted surveillance of TORION and NICHOLE. Cellular ping data showed TORION PHONE 1 phone to travel from Albert Lea, MN east on I-90 towards Wisconsin. At approximately 11:28 AM ping data showed TORION PHONE 1 to be in the area of Fox Lake Correctional Institution near Fox Lake, WI. TORION PHONE 1 remained at Fox Lake Correctional Institution until approximately 1:30 PM. TORION PHONE 1 traveled east to the area of Interstate 41 and then south towards Milwaukee, WI. At approximately 4:04 PM in the area of Interstate-94 at Rawson Rd. in Milwaukee County Wisconsin, your affiant observed SUBJECT VEHICLE 1 traveling south towards Chicago, IL on Interstate-94. Your affiant also observed TORION driving SUBJECT VEHICLE 1, and NICHOLE in the front passenger seat. Cellular ping data showed TORION PHONE 1 continued to the Chicago, IL. TORION PHONE 1 traveled back to Albert Lea, MN and arrived at approximately 6:35 AM on October 27, 2023.

33. On October 26, 2023, CORTEZ called NICHOLE. This phone call took place during the time of being in Chicago, IL. During the call NICHOLE sounded frightened. NICHOLE stated TORION left in a car and described the situation as bad. NICHOLE was told by TORION to go to TORION's grandfather's residence. Your affiant knows the grandfather of TORION to be Ronald BETHANY ("BETHANY"). During the same call, NICHOLE described an individual getting into the vehicle with herself and TORION and they drove around the block. TORION then left the area in another car with individuals she did not know but she was told to leave by TORION. NICHOLE stated she does not like guns or any part of the situation. NICHOLE advised this incident was not part of the plan. NICHOLE knew a partial license plate

for the vehicle TORION left in and wanted to chase after TORION. CORTEZ advised NICHOLE to not follow as she could be shot.

34. During the same call, CORTEZ continually reassured NICHOLE. CORTEZ stated several times TORION could be somewhere with the individual's discussing money. CORTEZ explained he knows who TORION deals with and mentioned an individual by the name of "Rocko." CORTEZ stated TORION could be with "Rocko" to get other items and discuss money. CORTEZ described the situation as part of the game. In my training and experience I believe the incident described by NICHOLE is consistent with that of a narcotic or firearms transaction.

35. CORTEZ and NICHOLE discussed going to "Redd's" and CORTEZ described the individual as living on Lockwood. Your affiant believes "Red" to be Ronald BROOKS, ("RONALD") the father of TORION. Your affiant knows RONALD to previously live at 1018 N. Lockwood Ave, Chicago, IL, 60651. During the same call a voice can, be heard giving GPS directions. The voice can be heard giving the direction to turn on to W. Augusta Boulevard. Your affiant knows W. Augusta Blvd and N Lockwood Ave is an intersection on the west side of Chicago, IL approximately two miles from the residence of BETHANY.

36. On October 27, 2023, CORTEZ contacted NICHOLE. Ping data indicated NICHOLE and TORION returned to Minnesota. NICHOLE described the incident on October 26, 2023, as TORION being in a horrible situation and a setback. The details of the incident described by NICHOLE appear consistent with that of some type of narcotics or firearms transaction and the loss of money.

37. CORTEZ stated TORION should send money. CORTEZ described the situation as a "snatch and run" and NICHOLE agreed. NICHOLE and CORTEZ agreed they could not

11

help TORION with the issue. Your affiant believes by the details given by CORTEZ and NICHOLE that the incident they discussed is consistent with theft. During the same phone call, NICHOLE stated TORION could not smoke all of her weed and that her weed is more expensive, and she can make more money from selling her weed.

38.     On October 30, 2023, your affiant responded to Fox Lake Correctional Institution in Fox Lake, WI. Your affiant located SUBJECT VEHICLE 1 in the parking lot of the facility. Agents observed TORION enter the driver's seat of the vehicle and drive to the front door of the facility. NICHOLE entered the front passenger seat of the vehicle and SUBJECT VEHICLE 1 left the facility.

39.     Agents continued surveillance and observed SUBJECT VEHICLE 1 travel from Fox Lake Correctional Institution to Milwaukee, WI. Case agents observed SUBJECT VEHICLE 1 travel to the area of 722 N. Water St in Milwaukee and park on the street. TORION exited the driver's seat of the vehicle and entered a business. NICHOLE remained in SUBJECT VEHICLE 1. Agents observed TORION meeting with an unknown black male next to SUBJECT VEHICLE 1. The unknown black male turned and walked across the street and entered a business. TORION departed in SUBJECT VEHICLE 1.

40.     Agents continued surveillance of TORION and NICHOLE. SUBJECT VEHICLE 1 parked in the roadway near 4060 N. 17th St in Milwaukee, WI. Agents observed an unknown individual get into the back seat of the vehicle. Agents observed the same individual emerge from the back seat of the vehicle carrying a rectangular box consistent with that of a firearm box. The individual crossed the street with the box and appeared to unlock the door at 4060 N. 17th St. The individual entered the residence.

12

41. SUBJECT VEHICLE 1 traveled to 4710 N 30th St in Milwaukee, WI. Your affiant previously observed TORION at this residence and know this residence to be used by TORION for firearm part deliveries, and other deliveries. Agents observed SUBJECT VEHICLE 1 parked behind the residence. TORION was observed placing a white box consistent with that of a firearm box in a trashcan next to SUBJECT VEHICLE 1.

42. On November 12, 2023, CORTEZ contacted NICHOLE. NICHOLE was upset over gasoline not being filled in SUBJECT VEHICLE 1 by TORION. NICHOLE described putting gasoline in SUBJECT VEHICLE 1 as needs to be done and part of the agreement. NICHOLE would not allow TORION further use of SUBJECT VEHICLE 1 if he does not refuel the car. NICHOLE advised she is struggling with money and will end everything. NICHOLE refused to beg TORION for money and knows that TORION is making hundreds of dollars and can fill SUBJECT VEHICLE 1 with gasoline. By the details of the "agreement" described by NICHOLE in this phone call, it appears NICHOLE and TORION have made an agreement on the use of SUBJECT VEHICLE 1. The use of SUBJECT VEHICLE 1 by TORION is seemingly part of TORION making money and NICHOLE having knowledge of TORION'S use of SUBJECT VEHICLE 1.

43. On November 12, 2023, CORTEZ contacted TORION. TORION and CORTEZ discussed the use of SUBJECT VEHICLE 1 and paying for gasoline in the vehicle. TORION mentioned he did not want to put gasoline in SUBJECT VEHICLE 1 for NICHOLE to use for pizza deliveries. Your affiant knows NICHOLE to be employed as a delivery driver for Domino's Pizza in Albert Lea, MN. CORTEZ and TORION discussed getting another residence in Albert Lea, MN. TORION refused to pay for gasoline for NICHOLE to deliver pizzas. TORION also refused to pay for gas if NICHOLE would do other drop offs. This leads your

13

affiant to believe SUBJECT VEHICLE 1 is being used to deliver other items outside of pizza deliveries related to NICHOLE'S occupation.

44.     On November 20, 2023, CORTEZ contacted NICHOLE from Fox Lake (WI) Correctional Institution.  NICHOLE and CORTEZ discussed NICHOLE visiting CORTEZ on this day.  NICHOLE and CORTEZ discussed picking up TORION.  Background noise on the call was consistent with a GPS notification with directions to Milwaukee, WI.

45.     On November 20, 2023, agents conducted surveillance of 4710 N. 30th St, in Milwaukee, WI.  Agents observed SUBJECT VEHICLE 1 parked in front of the residence. NICHOLE was observed seated inside SUBJECT VEHICLE 1. Agents observed TORION approach SUBJECT VEHICLE 1.  TORION opened the rear passenger and driver side doors and leaned into SUBJECT VEHICLE 1.  NICHOLE exited the driver's seat of SUBJECT VEHICLE 1 and moved to the front passenger seat.  TORION entered the driver's seat of the vehicle, and the vehicle departed from the residence.

46.     Case agents continued surveillance of TORION and NICHOLE.  SUBJECT VEHICLE 1 was driven by TORION towards Interstate 43.  Agents lost sight of the vehicle and terminated surveillance.  Your affiant reviewed cellular data related to TORION PHONE 1. TORION PHONE 1 traveled southbound to Chicago, IL from Milwaukee, WI after surveillance was terminated.  Cellular data for TARGET PHONE 1 indicated TORION traveled back to Albert Lea, MN hours later.  This travel pattern is consistent with other travel patterns after a visit with CORTEZ by NICHOLE and TORION at Fox Lake Correctional Institution.

47.     On November 16, 2023, your affiant spoke with Captain Brian Schueler of Fox Lake Correctional Institution. Captain Schueler advised CORTEZ was visited by TORION on November 14, 2023.  TORION and CORTEZ were observed drinking from the same juice bottle.

Captain Schueler advised this behavior to be consistent with passing contraband from TORION to CORTEZ.

48.     On November 27, 2023, CORTEZ contacted NICHOLE at approximately 8:12 AM.  These calls took place on November 27, 2023, prior to an in-person visit at Fox Lake Correctional Institution with CORTEZ, TORION, and NICHOLE.  TORION is suspected by Fox Lake Correctional Institution staff of attempting to introduce a white unidentified item of suspected contraband to CORTEZ.

49.     NICHOLE answered the call.  TORION was also present.  The background noise of the call is consistent with being inside a moving vehicle.  CORTEZ asked NICHOLE if "they" came.  CORTEZ also asked TORION if an item came.  TORION did not immediately know to what CORTEZ was referring.   CORTEZ referred to the items as items CORTEZ told TORION to request.  NICHOLE can be heard talking.  TORION began to understand.  This appeared to your affiant to be coded language to conceal what item was requested by CORTEZ. TORION stated to CORTEZ, CORTEZ will be "real happy."  TORION stated "Angie" was going "5 in 5" and TORION has figured out how to go "7 in 7."  Your affiant knows "Angie" can be a term for cocaine.  This appeared to your affiant to be coded language regarding narcotics.  CORTEZ asked TORION about "Big John" and getting a vehicle.  TORION described it as "not the move" and the vehicle not running well.  CORTEZ and TORION discussed looking for a vehicle. TORION expressed interest in improving his credit to obtain a vehicle.  CORTEZ suggested TORION could get a job and provide pay stubs.  TORION stated he is in the process of having them made by an individual.  Your affiant knows through training and experience that pay stubs can be fraudulently made by individuals and will be used when needed to provide proof of employment.

15

50.     On November 27, 2023, at 12:32 PM, CORTEZ placed a second call to NICHOLE.  The call was answered by NICHOLE and the background noise was consistent with NICHOLE being in a moving vehicle.  TORION can also be heard talking.  NICHOLE stated they are still in Chicago.  TORION described being in Chicago approximately one hour and went to "the store".  TORION stated he is picking up clothes and shoes and has put off doing so each time they have gone to Chicago.  TORION further their location as driving in the area of Harvey, IL.  Your affiant Harvey, IL to be approximately twenty-two 22) miles south of Chicago, IL.  While driving, TORION saw police and wanted to stay away from police.  CORTEZ also advised TORION and NICHOLE to stay away from the police.  CORTEZ described the police as looking for "pipes, fetty, and boy."  Your affiant knows "pipes" to be a term for firearms, "fetty" to be a term for fentanyl, and "boy" to be a term for cocaine.  CORTEZ asked TORION about "Rocko" getting "pens." Agents believe "Rocko" to be located in Chicago, IL.  Your affiant knows "pens" can be a term for cannabis vape devices.  TORION spoke with an individual identified as "Turkish" and was told to come to their "warehouse."  TORION advised "Turkish" is in Turkey right now and TORION expressed interest in traveling to Turkey.  TORION also described Turkey as being different than America leading your affiant to believe TORION to be referencing the country of Turkey.

51.     TORION stated they are in Riverdale.  Your affiant Riverdale, IL to be a city approximately 21 miles south of Chicago, IL.  A short time later, a sound can be heard in the background consistent with that of a car door opening and shutting.  NICHOLE remains on the phone.  A second male voice can be heard talking to NICHOLE and TORION and tell TORION to come in.  CORTEZ placed a third call to NICHOLE at 1:53 PM.  TORION provided their location being in Indiana.  Your affiant is aware SUBJECT VEHICLE 1 was observed by

16

Merrillville (IN) Police Department traffic cameras on the same date at approximately 1:32 PM in the area of 73rd Ave & Whitcomb St, Merrillville, IN 46410. CORTEZ placed a fourth call to NICHOLE at 3:28 PM. NICHOLE stated they are on their way to see CORTEZ. TORION advised they are approximately three hours away. Your affiant is aware that SUBJECT VEHICLE 1 was observed by Illinois State Police traffic cameras in the area of 436 W Grand Ave, Chicago, IL 60654. NICHOLE and TORION discuss being stopped in traffic delaying their travel.

52. CORTEZ placed a fifth call to NICHOLE at 4:15 PM. NICHOLE and TORION were still driving. CORTEZ asked NICHOLE about the quality of "pens" she obtained. Your affiant knows "pens" to be cannabis vape devices. NICHOLE stated she obtained ten pens and also obtained one ounce of "weed." NICHOLE advised she is being contacted about the items. NICHOLE believes she can get more at any time. CORTEZ suggested NICHOLE buy more so she does not run out. NICHOLE stated one hundred pens were purchased for $1,200 and possibly "fronted." Your affiant knows "fronted" to mean, typically in narcotic sales, the item is given to the person and the person sells the item and later pays the supplier after the items are sold. CORTEZ believes the $1,200 purchase could be turned into $5,000 when the pens are resold. With the discussion of prices and profit, this led your affiant to believe NICHOLE is actively selling cannabis pens and marijuana.

53. TORION, NICHOLE, and CORTEZ discussed getting food when they arrive for visitation at Fox Lake Correctional Institution. All three discuss getting a bottle of juice and "Snapple." TORION described the "Snapple Apple" as a "lifesaver" and three begin laughing. Your affiant knows during the visit at Fox Lake Correctional Institution later on the same date,

17

an unidentified item of contraband was suspected to have been passed to CORTEZ by TORION in a Snapple juice bottle in an in-person visit.

54.     Your affiant reviewed reports related to an incident on November 27, 2023, at Fox Lake Correctional Institution.  Staff previously observed a pattern of behavior during CORTEZ'S visits after review of video footage from the dates of September 1, 2023, October 30, 2023, November 14, 2023, and November 23, 2023.  The pattern of behavior was described as consistent with delivery of contraband from TORION to CORTEZ.

55.     On November 27, 2023, NICHOLE, TORION, and CORTEZ participated in an in-person visit at Fox Lake Correctional Institution.  During the visit, TORION was seen with two juice bottles.  TORION was observed by staff spitting an unidentified white object into one of the bottles.  CORTEZ was seen taking the same bottle, drinking from the bottle, and ingesting the unidentified white object.  Fox Lake Correctional Institution staff then moved in, secured CORTEZ, and terminated the visit.

56.     CORTEZ was asked about the ingested white object and did not reply.  CORTEZ was placed in restraints and taken to restrictive housing.  TORION was asked by Fox Lake Correctional Institution staff about the item from the bottle but did not reply and began to cry. TORION and NICHOLE'S visitation privileges were suspended until December of 2024.  Your affiant believes the item passed to CORTEZ, based on the behavior exhibited by TORION and NICHOLE leading up to the visit, was narcotics.

57.     On December 12, 2023, TORION traveled by Greyhound bus lines from Minneapolis/St. Paul, MN to Milwaukee, WI.  Your affiant reviewed ping data related TORION PHONE 1 which indicated the device to be in the area of the Milwaukee Intermodal Station located at 433 W St. Paul Avenue, Milwaukee, WI 53203 on the morning of December 12, 2023.

18

TORION was observed by agents at 4710 N. 30th St, Milwaukee, WI, 53209.  Your affiant knows this location to be where TORION received firearm parts and accessory deliveries from CBC Industries.

58.     On December 12, 2023, RONALD contacted TORION from Racine, WI, Correctional Institution.  TORION expressed intent to stay in Milwaukee a few days, then travel to Chicago, IL by train, and then to Houston, TX by train, and then travel to Dallas, TX.

59.     RONALD contacted TORION on December 14, 2023.  TORION discussed intent to travel to the "city" and said he will leave on December 18, 2023, at 1:55pm.  Your affiant reviewed train schedules from Chicago, IL to Houston, TX.  Amtrak provides a departure from Chicago Union Station at 1:55 PM on December 18, 2023, to Houston, TX, Amtrak Station.

60.     On December 17, 2023, CORTEZ contacted NICHOLE from Fox Lake Correctional Institution. NICHOLE advised CORTEZ of TORION being "out of town."  This leads your affiant to believe TORION would return after traveling to Texas.  NICHOLE placed a phone call to allow CORTEZ to speak with TORION.  TORION stated he was in line for the train to Chicago, IL.

61.     On December 18, 2023, your affiant was notified by the Amtrak Police Department of a purchase of a travel ticket related to the phone number of TORION PHONE 1. The purchase was reported as fraudulent.  The Amtrak Police Department provided the following information for the purchase, Reservation #: 5349C5, Passenger Name: DAVIS/GARY, Credit Card #: Ending in 5425, Email Address: FITZCHARLES@OUTLOOK.COM, Phone number: 872-243-4797 (TORION PHONE 1), Purchase Date & Time (PST): December 16 2023, 11:14P.M., Travel Date: December 26, 2023 to December 27, 2023, Travel Location: Dallas to Chicago to Milwaukee.  This pattern of fraudulent activity is consistent with other fraudulent

19

credit card purchases of firearms parts and accessories by TORION from CBC Industries and other businesses.

<u>**FIREARM ACTIVIES IN MINNESOTA**</u>

62.     Your affiant reviewed a CBC Industries sales invoice for an order dated September 21, 2023.  The billing information was "Berris Reid Rncarms 20723 Morning Star Rd, Lead, SD 57753."  The shipping address was "Berris Reid Rncarms 210 Front St E Unit 205, Albert Lea, MN 56007."  The order was for approximately $1,177.05 and the order was for three 5" 300AAC caliber AR-15 micro upper assemblies, and two 5" 5.56 NATO caliber AR-15 micro upper assemblies.  This order was consistent with other fraudulent orders by TORION from CBC Industries.  Your affiant knows when these parts are paired with an AR-15 lower receiver, the parts can be readily converted to a functioning firearm.  FedEx records indicated the order was delivered to the aforementioned address in Albert Lea, MN on October 11, 2023, and was signed for by "T. BROOKS" at 12:29 PM.

63.     On November 18, 2023, at approximately 11:30 AM, CORTEZ contacted TORION.  TORION explained he has a workshop going on.  TORION and CORTEZ discussed NICHOLE being upset over issues with TARGET RESIDENCE 1 being unclean.  TORION described having a printer, and it is one of the issues with NICHOLE.  TORION described the printer as printing plastic. TORION stated he is letting the printer run and the printer is printing plastic while sitting on a table. TORION would further describe the printer as printing money.  Your affiant knows a 3D printer to use plastic to print plastic items.  Your affiant also knows with the parts and components previously purchased by TORION from CBC Industries, a 3D printer could be used to manufacture and complete functional firearms.  TORION in the past has explained he has built and sold firearms in jail calls with CORTEZ reviewed by your affiant.

Your affiant believes the printer is being used to manufacture firearms and is not printing United Stats currency. With the issues described between NICHOLE and TORION, this leads your affiant to believe TORION is living at the residence and is expected to help maintain the residence.

## NARCOTICS ACTIVITIES IN MINNEOSTA

64. On September 5, 2023, an email communication was sent by NICHOLE to CORTEZ. NICHOLE expressed an intent to focus on her house and her bills. NICHOLE also stated she will "kick out gas here and there." Your affiant knows "gas" to be a term for cannabis.

65. On September 21, 2023, an email communication was sent by NICHOLE to CORTEZ. NICHOLE stated she needs basic items for her residence and is struggling to afford them. NICHOLE further explained TORION would pay a woman $40 related to a dog and would also pay in "tree." Your affiant knows "tree" to be a term for cannabis. NICHOLE advised she would pay the woman if TORION did not.

66. On November 17, 2023, at 8:00 PM, CORTEZ, TORION and NICHOLE participated in a video visitation. NICHOLE stated she just got in the house. NICHOLE appears to be in a bedroom. NICHOLE'S side of the video goes blank for several minutes. When the video resumes TORION is on screen. TORION displays yellow package Backwoods brand banana flavored cigars. TORION states he is going to roll up something nice. Your affiant knows through training and experience that these types of cigars are often unrolled and used to smoke cannabis by removing the tobacco and replacing it with cannabis, and then rerolling them. TORION is seen on screen motioning his hands in a manner consistent with that of rolling and unrolling a cigar.

67. TORION expressed interest in obtaining a car to go to the city. While there, TORION would be meeting an individual identified as "Rocko" and get up with "Angie" and come back. Your affiant knows "Angie" to be a term to mean cocaine. CORTEZ asked TORION how much more he would need. CORTEZ stated he has 450 sitting on the app. This leads your affiant to believe CORTEZ has access to a financial application to exchange money.

68. On November 21, 2023, a video visit took place between CORTEZ, TORION, and NICHOLE. NICHOLE and TORION appear to be together inside a residence that is consistent with NICHOLE'S residence in Albert Lea, MN. TORION can be seen on screen and states he was putting together "the angie." Your affiant knows "Angie" to be a term for cocaine.

69. On December 3, 2023, CORTEZ contacted NICHOLE. TORION was also present during the call. TORION advised CORTEZ a box of "weed pens" were stolen by "Kai" Your affiant knows NICHOLE to have a son, a juvenile whose name contains the name "kai." I am aware that on November 27, 2023, NICHOLE and TORION traveled to the Merrillville Indiana, and Chicago, Illinois area. During that time, NICHOLE stated on jail calls with CORTEZ she purchased cannabis pens and marijuana.

70. On December 7, 2023, BROOKS contacted TORION from Racine, WI, Correction Institution. TORION advised he is in Minnesota and working. RONALD and TORION discuss money owed by TORION to individuals. RONALD lectures TORION on his behavior and actions and how it could lead to TORION being arrested. RONALD also compares TORION'S actions to the actions of his own. RONALD further described the actions of others TORION is involved with as "dope fiend" and TORION'S mistakes being a "$5,000 lesson." Your affiant knows RONALD to be incarcerated for convictions related to narcotics sales in

22

Milwaukee County, WI. This leads your affiant to believe RONALD fears of TORION selling narcotics and could be arrested and face incarceration.

**WILLIAMS, TORION, AND FRANKLIN JR and "ROCKO" (JERMAINE C. NASH)**

71. Your affiant reviewed attempted orders from CBC Industries. Orders placed to CBC Industries over the weekend of August 25, 2023, include both the names Todrian FRANKLIN and Torion BROOKS. The orders used various billing names and addresses and was consistent with other fraudulent purchased by TORION from CBC Industries. The orders ranged in price from approximately $784 to $1,210.

72. Your affiant reviewed information related to attempted purchases online purchases from 5D Tactical located at 10073 Valley View #403, Cypress, CA 90630. On September 26, 2023, order #5364442 ($114.95) and order #5364443 ($114.95) utilizing a Visa credit card ending in "8563" was declined. Both orders displayed the following information. Billing information, Michael Williams 3219 N. 46th St, Milwaukee, WI 53216, phone 414-852-7259, email. Shipping information Mike Mike, 3219 N. 46th St, Milwaukee, WI 53216. I reviewed ping data related to TORION PHONE 1. Approximately seventy-five calls took place between TORION PHONE 1 and 414-852-7259 from the date of October 4, 2023, to December 21, 2023.

73. Your affiant reviewed Amtrak ticket information related to Amtrak reservation #5382A9. This reservation was made utilizing a fraudulent credit card. Below is the information from the purchase. Reservation #5382A9, Passenger name Todrian Franklin, Passenger name Michael Williams, Email address: Todrainf78@gmail.com, Phone: 414-982-8610, Payment: Mastercard #5424181493167782, Price: $542.00, Origin Houston, TX, Destination: Chicago, IL, Departure date: 12/19/2023 1:05 PM, Arrival date: 12/20/2023 1:42 PM.

23

74.     Your affiant obtained recorded customer service calls from the Amtrak Police Department related to the reservation.  It should be noted, the credit card information is redacted by Amtrak from the recording.

75.     On December 18, 2023, a call was placed from TORION PHONE 1.  Your affiant knows this phone number to be associated with TORION.  A female operator is heard on the phone call speaking with a male voice known by your affiant to be TORION.  TORION stated he was trying "check in" his nephew's ticket.  TORION provided the reservation #5382A9.  The operator instructed TORION to provide the payment information.   TORION provided information for three credit cards.  TORION stated he would try back and ended the call.

76.     On December 18, 2023, a call was placed from TORION PHONE 1 to Amtrak customer service.  Your affiant recognized the caller as TORION.  TORION explained he was calling to check in train tickets for his "son" and "brother". TORION provided the reservation #5382A9 to the operator.  BROOKS provided the names "Todrian Franklin" and "Michael Williams."  The operator gave a total of $542 for the tickets and confirmed the names on the ticket as Todrian Franklin and Michael Williams.  The destination was confirmed as Houston, TX, to Longview, TX, to Chicago, IL.  TORION replied to the operator "sounds good."  A long portion of the call is redacted with a beeping sound.  The operator can be heard returning to the line and stating, "that one works."  This is consistent with BROOKS attempting multiple credit cards to purchase the tickets.  The operator identified the transaction as paid for and TORION confirmed the information was "sent to the email."

77.     Your affiant reviewed Longview, TX, Police Department (LPD) reports detailing the arrest of Michael L. WILLIAMS ("WILLIAMS") and Todrian M. FRANKLIN JR

24

(FRANKLIN).  The incident occurred on December 19, 2023, at approximately 5:19 PM, at 908 Pacific Ave, Longview, TX, 75602.

78.     WILLIAMS and FRANKLIN JR were contacted at the aforementioned address while transferring from a Greyhound bus to an Amtrak train.  Information was obtained from the Amtrak Police Department by LPD regarding WILLIAMS and FRANKLIN JR transporting narcotics and were to be trespassed from the Amtrak train. An LPD narcotics K9 alerted to the luggage of WILLIAMS and FRANKLIN JR. A state search warrant was obtained by LPD for the luggage of WILLIAMS and FRANKLIN JR.  Approximately 132 bottles of promethazine syrup labeled "Promethazine SYR PLAIN 6.25MG/5ML QTY:12" were located in the search of four total pieces of luggage possessed by WILLIAMS and FRANKLIN JR.  WILLIAMS and FRANKLIN JR were arrested for the Texas state charge of Deliver/Offer Dangerous Drugs and transported to the Gregg County, TX, Sheriff's Office (GCSO) Jail in Longview, TX.

79.     Your affiant reviewed jail phone calls placed by BROOKS on December 20, 2023, from Racine, WI, Correctional Institution to TORION.  On December 20, 2023, at 8:12A.M., RONALD placed a phone call to the phone number 708-645-6737. A female answered the call.  Your affiant knows this number to be related to Sydney A. Blakely per WI Department of Corrections (DOC) inmate visitation information.  Blakely advised "your son" sent a text message last night (i.e., December 19, 2023).  Your affiant knows TORION to be the son of RONALD.  TORION asked Blakely to have RONALD contact TORION.

80.     On December 20, 2023, at 8:16 AM, RONALD placed a call to Blakely under the inmate account of Tramayne Massie. Blakely used "the other phone" to contact a TORION. TORION advised RONALD about an incident in Longview, TX involving TORION'S "little brother and little homie."  TORION stated both individuals were "going back on the train".

TORION believed an individual, identified as "Jaylen," contacted Amtrak and the Unites States Marshal Service (USMS) and reported two travelers, traveling with "a large amount of drugs. Your affiant believes "Jaylen" to be Jaylen BETHANY. TORION explained the individuals had "drank." Your affiant knows "drank" to be a term for promethazine syrup. TORION described the substance as "green" and did not contain codeine. Your affiant knows promethazine syrup can be a green liquid and is available with or without codeine. RONALD warns TORION of being "hot." Your affiant knows "hot" to be a term for being under investigation by law enforcement.

81. On December 20, 2023, at 8:45 AM, RONALD placed a call to TORION. RONALD and TORION resumed their conversation from the previous call. Your affiant believes TORION was speaking about WILLIAMS and FRANKLIN JR. RONALD advised TORION and BETHANY to not be "police." RONALD and TORION discussed "Rocko" using the individuals as a "get out of jail free card." In reference to the items taken and "Rocko", TORION stated "it was all his." TORION stated the incident in Texas cost "Rocko" "eleven thousand." Your affiant believes this to mean $11,000. TORION stated the individual who reported to the USMS did not know the arrested individuals "government names." TORION stated FRANKLIN JR knows "Rocko". TORION also did "all the communicating" with "Rocko." RONALD warned TORION about being involved with a conspiracy and TORION acknowledged knowing what a conspiracy is. RONALD described TORION'S action as "facilitating." TORION stated he was trying to help WILLIAMS and FRANKLIN JR "make a couple dollars" and both were looking to TORION to make a "couple dollars." RONALD asked TORION why he would get involved for a small amount of money. TORION said he thought things would "go right."

82.     RONALD placed a call to TORION at 9:29 AM.  RONALD asked TORION about "Rocko." TORION said he has been asked by "Rocko" about what is going on with WILLIAMS and FRANKLIN, and that TORION does not know.  TORION stated FRANKLIN was charged with a "pint or two" and the rest was placed on WILLIAMS.  RONALD again warned that TORION is "hot."  RONALD warned TORION about helping others and said that is why RONALD is incarcerated.  Your affiant knows RONALD to be incarcerated on heroin related charges from Milwaukee County, WI.  RONALD warned TORION he is placing himself in harm's way.

83.     RONALD placed a call to Blakely at 10:22 AM.  RONALD described TORION as getting WILLIAMS and FRANKLIN into some "Rocko shit."  RONALD further described the situation as a "promethazine case" and a "fed case."

84.     On December 21, 2023, RONALD placed a call to the number 872-319-9671. Your affiant knows this number to be related to Rashod "Fat Man" BETHANY.  BETHANY asked if RONALD was aware of the situation with TORION, WILLIAMS, and FRANKLIN. RONALD said he believes TORION has more involvement than TORION is saying. BETHANY stated he lectured "both of them" over the phone on December 20, 2023.  Your affiant believes BETHANY contacted both TORION and "Rocko."  Ping data related to TORION indicated TORION received a call from BETHANY on December 20, 2023, at approximately 7:24 PM.  BETHANY described the actions of TORION, WILLIAMS, and FRANKLIN as "mules."  Your affiant knows "mule" to be a term for an individual who transports narcotics for distribution between the supplier and seller for payment.  BETHANY stated TORION, WILLIAMS, and FRANKLIN do not want any "training or grooming."  Your affiant believes BETHANY is speaking of training and grooming to sell narcotics.

85.     On December 21, 2023, a call was placed to TORION by Dameon Highshaw from Racine, WI, Correctional Institution.  TORION and Highshaw discussed WILLIAMS and FRANKLIN.  TORION stated he had to get both individuals out of jail.  TORION had to "pay a bond" and was short on money for sports bets for RONALD.  TORION ended the call by stating he is receiving "another jail call."

86.     On December 21, 2023, RONALD placed a call to Blakely.  RONALD called TORION a "liar" and said he believes TORION is involved with "Rocko" more than TORION will say.  RONALD described being skeptical of the situation and if the charges are state or federal charges.

## JAIL CALLS OF JANUARY 21–25, 2024

87.     I reviewed jail calls placed by CORTEZ to NICHOLE occurring between January 21, 2024, and January 25, 2024.

88.     On January 21, 2024, CORTEZ placed a call to NICHOLE at 4:23 PM.  TORION was also present with NICHOLE during the call.  TORION stated he had to "switch out this rental."  Your affiant knows NICHOLE to be using a rental vehicle (SUBJECT VEHICLE 2, 2023 Nissan Rogue, white, VIN 5N1BT3BB5PC907900, Michigan license plate ETW1619) while SUBJECT VEHICLE 1 is being repaired.  Law enforcement officers obtained through a subpoena that NICHOLE rented SUBJECT VEHICLE 2 from Mason City IA.  TORION said he is waiting for SUBJECT VEHICLE 1 to be fixed and will take "one of these cars" and go to "the city" and "get us reloaded."  TORION also explained, an individual left car keys in "the rental" and TORION had to drive to the "cities."  Your affiant knows "cities" to be a common nickname for Minneapolis and Saint Paul, MN.  TORION discussed learning how to "print."  TORION explained an individual being arrested for charges related to domestic violence, firearms and nine

28

"switches." Your affiant knows a "switch" is a device used to covert a pistol to fire in a fully automatic mode. TORION said the individual was released from jail. CORTEZ warned TORION not to have the individual over and TORION stated the individual was "blocked" and cannot talk to TORION.

89. Your affiant reviewed Albert Lea, MN, Police Department (ALPD) reports related to the arrest of Isaac M. BONILLA ("BONILLA") at 2019 Main St E., #311 on January 13, 2024. Your affiant knows this location to be a Motel 6. Your affiant knows that in the past TORION discussed with CORTEZ buying a laptop computer and a printer at a Motel 6. During the incident, ALPD reports indicate several 3D printed firearms, ammunition, and privately made firearms firearm parts were located.

90. Your affiant reviewed cellular data related to TORION PHONE 1. Your affiant located a phone number of 507-461-5276 for BONILLA. Your affiant located a CashApp profile with the display name Isaac BONILLA CashTag $MarioLMB. CashApp records for a profile related to TORION showed TORION was paid $21.00 by BONILLA on November 19, 2023. Cellular data for TORION PHONE 1 also indicated outgoing and incoming communication with the phone number 507-461-5276 between November 15, 2023, and January 6, 2024.

91. On January 23, 2024, CORTEZ placed a call to NICHOLE at 7:41 PM. TORION was also present during the call. CORTEZ advised TORION that CORTEZ has "figured it out" and stated "BCF, the first and only black cartel family." NICHOLE warned CORTEZ to stop and be released first. CORTEZ further explained they are "worse" than "the Mexicans in Mexico." Your affiant knows Mexican cartels to be involved in firearms trafficking, narcotics trafficking, and violence.

29

92.     On January 24, 2024, CORTEZ placed a call to NICHOLE at approximately 2:14 PM.  NICHOLE advised she has not called about her vehicle and is driving another vehicle.  Your affiant knows NICHOLE and TORION to use SUBJECT VEHICLE 2 while SUBJECT VEHICLE 1 is being repaired.  CORTEZ and NICHOLE discussed plans for TORION'S birthday to include travel to both Minneapolis, MN, and Chicago, IL.  NICHOLE explained she is trying to get TORION'S girlfriend to come.  CORTEZ asked, "which one" and NICHOLE stated TORION'S girlfriend lives in Arizona.

93.     Also on January 24, 2024, CORTEZ placed a call to NICHOLE at approximately 3:37 PM NICHOLE also placed a call to TORION while on the phone with CORTEZ.  NICHOLE stated she has called about SUBJECT VEHICLE 1 and the business is not open today, January 24, 2024.   NICHOLE can be heard talking to an unidentified individual.  NICHOLE mentioned she does not see TORION moving when "his dad gets out."  Your affiant knows TORION'S father, Ronald BROOKS is incarcerated and nearing his release.  NICHOLE said she knows TORION has community service to complete.  Your affiant TORION to be on probation in Cook County, IL.

94.     Also on January 24, 2024, CORTEZ placed a call to NICHOLE at approximately 5:43 PM.  CORTEZ instructed NICHOLE to have TORION send CORTEZ money.  CORTEZ also instructed NICHOLE to have an individual identified only as "Duke" set up a visit with CORTEZ.  NICHOLE describes her CashApp account as "Felicia."

95.     Your affiant reviewed Fox Lake, WI, Correctional Institution visitation records.  On January 24, 2024, CORTEZ sent a "visitation outreach request."  The "visitor details" provided identified the visitor request for Name: Deangelo Alboyd-Brown ("ALBOYD-BROWN").

30

96.     Your affiant reviewed the criminal history of ALBOYD-BROWN.  ALBOYD-BROWN was found to be convicted of Possess w/Intent-Cocaine (>5-15g) (Felony) on January 4, 2018, in Milwaukee, WI, County Circuit Court.  ALBOYD-BROWN was also convicted in the same court on the same date for Possess w/Intent-Heroin(>3-10g).

97.     Also on January 24, 2024, CORTEZ placed a call to NICHOLE at approximately 6:45 PM.  CORTEZ asks NICHOLE to make a phone call to TORION.  NICHOLE placed a call to TORION. CORTEZ stated he would call TORION on January 25, 2024, in reference to that "Sko tip."  I believe "Sko" to be ALBOYD-BROWN.

98.     Also on January 24, 2024, CORTEZ placed a call to NICHOLE at approximately 8:31 PM.  NICHOLE calls for TORION to come to her.  NICHOLE stated TORION is rolling a "blunt."  Your affiant knows a "blunt" to be a cigar with the tobacco replaced with cannabis.  TORION is present during the call.  TORION stated he was "trying to make this play down in Milwaukee" and has "my lil' guy doing something for me."  TORION also stated he needs to take a trip to Milwaukee because he is "almost done."  TORION said he did not know if NICHOLE would not go with TORION and would later pick TORION up.  TORION and CORTEZ discussed number figures for Leon ALBOYD and appeared to use coded language.  CORTEZ also instructed TORION to take an unspecified item with him to have on "stand by."  TORION also received a phone call from a female he described as "one of my situations."  NICHOLE can be heard describing the female as "Milwaukee."  In response to NICHOLE, TORION stated the female lives in California but is "running around hustling" and "be on the same shit I be doing" and is in Milwaukee "on business."

99.     Your affiant reviewed cellular data related to TORION PHONE 1 during the time of the call from CORTEZ.  Data from TORION PHONE 1 indicated two incoming calls from the

31

number 414-850-1409. Your affiant knows this number to be related to Todrian FRANKLIN, a known associate of TORION. TORION PHONE 1 also communicated with the number 414-865-6073. Your affiant knows this number to be related to Jasmine M. Riofrio.

100. On January 25, 2024, CORTEZ placed a call to NICHOLE at 3:37 PM. During the call, NICHOLE and CORTEZ discuss the cost to repair SUBJECT VEHICLE 1. NICHOLE expressed concerned about the cost and the length of time for the repairs. CORTEZ stated without the vehicle NICHOLE could not go to Chicago or do other things. Your affiant knows TORION and NICHOLE to have traveled several times using SUBJECT VEHICLE 1 between Indiana, Illinois, Wisconsin, and Minnesota.

101. Also on January 25, CORTEZ placed a call to TORION at approximately 4:08 PM. During the call CORTEZ asked TORION about his plan to go to "The Mil" Your affiant knows "the Mil" to be a term for Milwaukee. TORION stated he is unsure when he will be able to go. CORTEZ stated "we" need to "figure something out" so TORION can do "what you got to do too." TORION stated he "needs" to get to Milwaukee.

## KENOSHA COUNTY WISCONSIN ARREST

102. On February 3, 2024, TORION and Jaylen BETHANY were arrested by the Kenosha County, Wisconsin, Sheriff's Department (KCSD) after a traffic stop SUBJECT VEHICLE 2 near the 2900 block of Interstate 94 in Kenosha County Wisconsin. TORION and BETHANY were both arrested on Wisconsin state charges to include possession with intent cocaine > 15 to 40 grams, possession with intent over 40 grams party to a crime, possession with intent-fentanyl (>50 grams), possession with intent designer drugs >10 to 50 grams, and possession of marijuana. Additionally, TORION was arrested on a Cook County Illinois arrest warrant.

32

103.    Also located in the SUBJECT VEHICLE 2 by KCSD was a black bag containing small flakes that appeared consistent with metal shavings, a sealed Grey Ghost Precision aftermarket Glock pistol slide manufactured to fit a Glock 17, generation 5, version 3 pistol box, miscellaneous tools, a 5D tactical Router HG Pro, a table top Wolfcraft brand drill press vise, and an empty Ziploc style bag with a label on it which had the logo for SOTA Arms and "AR15 Lower Parts Kit."  These items appeared to be consistent with the manufacturing of firearms. Your affiant knows SOTA Arms to be business that sells firearms and firearm accessories online and is located at 39719 Grand Ave, North Branch Minnesota.

104.    On February 21, 2024, your affiant obtained sales records from SOTA Arms. Invoices showed several orders appeared to be fraudulent causing a financial loss for SOTA Arms or were declined by SOTA Arms between September 15, 2023, and September 27, 2023. The orders used various emails addresses known to case agents to be used by TORION and fraudulent credit card information to obtain AR-15 parts and accessories.

105.    Your affiant obtained sales records from RSR Group a business which sells firearms parts and accessories online.  RSR Group records indicated a Grey Ghost Precious pistol slide with matching Stock number GGPGGP175OCODV3 to the one recovered by KCSD during the arrest of TORION, was sold on August 4, 2023, by Somar Tek LLC to "Gary Adams" and shipped to 4710 N. 30th St, Milwaukee, Wisconsin, 53209.  Your affiant knows this address to be used in the past by TORION for firearms parts related deliveries.  Your affiant also knows Somar Tek LLC to be a Federal Firearms Licensee located W191 S7691, W191S7691 Racine Ave, Muskego, WI 53150.

106.    During the arrest of TORION and BETHANY, KCSD deputies took two phones into custody.  One blue apple iPhone was taken from BETHANY and a gray Apple iPhone was

33

taken from TORION. Your affiant believes the phone taken from TORION is TORION PHONE

1. KCSD obtained a state search warrant in Kenosha County, Wisconsin for the phones on

February 12, 2024, and data was extracted from both devices..

### JERMAINE C. NASH AND TARGET PHONES 1 AND 2

107.     TORION placed a call to the phone number 708-645-6737 at approximately

10:10P.M on February 3, 2024. Your affiant knows this number to be used by Sydney Blakely,

an associate of TORION. TORION begins the call by stating he is "locked up". Blakely stated

she was aware and was contacted by "Rocko". Based the Affiant's review of telephone numbers

and iCloud accounts associated to Jermaine C. Nash, Affiant believes "Rocko" is Jermaine C.

NASH. TORION asked Blakely to contact his uncle. Your affiant believes this to be Rashod E.

"Fat Man" BETHANY. TORION stated he was stopped by police near Maywood, IL, while

handling "my business" prior to his arrest. During that stop he was released. TORION stated if

he receives a bond to be released from jail, TORION'S "people" have "bread." Your affiant

knows "bread" to be a term for money.

108.     On the same date, TORION placed a call to the phone number 920-808-1280 at

approximately 10:17P.M. Your affiant knows this number to be related to Nichole BROOKS,

(Hereinafter "NICHOLE") the aunt of TORION. TORION apologized to NICHOLE for "not

making it back." NICHOLE stated she has been contacted by TORION'S family members.

TORION asked NICHOLE to apologize to "my uncle." Your affiant believes this to mean

Cortez BROOKS.

109.     On the same date, TORION placed a call to NICHOLE at approximately

10:47P.M. TORION requested NICHOLE call TORION'S brother at 414-850-1409. Your

affiant knows this phone number to be related to Todrian FRANKLIN JR, the brother of

TORION.  TORION stated he had "power tools" in the vehicle. Your affiant knows TORION was in possession of several tools and accessories consistent with firearms manufacturing at the time of his arrest by KCSD.

110.   On the same date, TORION placed a call to 414-850-1409 at approximately 10:53P.M.  Your affiant knows this number to be related to Todrian FRANKLIN JR.  TORION stated he was dropping BETHANY off at "Cam's house."  Your affiant knows the address 254 Veranda Ln was visible in plain view on the phone of TORION at the time of TORION'S arrest. Your affiant knows Cameron J. BRITT to be an associate of TORION and live at 336 Veranda Ln #206, Mount Pleasant, WI, 53406.  TORION stated he was ten minutes away from the location.  TORION asked FRANKLIN JR to get the "tools" and get to "work" and to do it "as much as possible."  Your affiant believes this to be instruction by TORION to use the tools in the car to continue to manufacture firearms.

111.   On the same date TORION placed a call to 414-850-1409 at approximately 11:01P.M.  TORION asked FRANKLIN JR for "Mike Mike's" number.  Your affiant believes this to be Mike WILLIAMS.  TORION also asked FRANKLIN JR to contact WILLIAMS. TORION spoke with a second unidentified individual over the phone.  TORION stated he would get the "tools" back and gave instructions to "get back to work" and it is all TORION has to his "bond money."  The male stated it can be done "at my crib."  Your affiant knows "crib" to be a term for residence.

112.   On the same date, TORION placed a call to 480-255-9557 at approximately 11:07P.M.  The call was answered by a female.  TORION stated he needs the "tools" from the vehicle so his brother can "get to work."  The female asked for "Todrian" to keep her in the "loop."  TORION also asked for the female to contact "Cam."  Your affiant believes this to be

35

Cameron BRITT. TORION stated he was ten minutes away from BRITT'S residence when he was arrested. The female provided the number 414-439-7884 for BRITT.

113. On February 4, 2024, at approximately 9:08A.M. TORION placed a call to 480-259-9557. TORION instructed the female to call NICHOLE. NICHOLE joined the call. CORTEZ is also present on the line with NICHOLE. TORION instructed NICHOLE to get the "power tools" from the vehicle so TORION'S brother can "get to work." TORION asked NICHOLE if she recalls the "Isaac situation." TORION described this as "that happened" but nothing has been done. Your affiant knows Isaac BONILLA was arrested previously in Albert Lea, Minnesota for several firearms related charges and evidence of privately manufactured firearms was recovered. TORION discussed with NICHOLE a plan of an unidentified person taking an unidentified item to NICHOLE so that it "does not stop." This appeared to be language to conceal what is being taken to NICHOLE.

114. On the same date, TORION place a call to Crista Rosales at approximately 12:06P.M. TORION instructed Rosales to call BRITT. Rosales placed a call to BRITT while on the phone with TORION. TORION asked BRITT to provide money for TORION'S jail account. BRITT advised TORION, "Big Kevin", "Little Kevin", and "Michael" do not have "love" for TORION. Your affiant believes "Big Kevin" to be Kevin WILLIAMS SR, "Little Kevin" to be Kevin WILLIAMS JR, and "Michael" to be Michael "Mike Mike" WILLIAMS. BRITT stated he advised the three individuals of TORION'S arrest. BRITT and TORION discussed TORION speaking with BRITT prior to his arrest on Facetime. Rosales stated she could provide an Uber for BRITT to the Kenosha County jail. TORION instructed Rosales to contact "my brother." A male voice can be heard, and TORION instructed the male to provide money for TORION'S jail account. TORION asked for a number for "Rocko" to be provided for Rosales. The number

36

773-426-3316 (**TARGET PHONE 1**). Your affiant knows this number to be related to Jermaine C. "Rocko" NASH. TORION instructed Rosales to call NASH.

115. On the same date, TORION placed a call to Rosales at approximately 12:22P.M. Rosales stated she is attempting to call NASH. The call is made, and a male can be heard talking to TORION. TORION expressed a need for NASH to get the "Sota" together and start making "bond" and "lawyer" money. Your affiant believes this to mean Minnesota. TORION provided the phone number 920-808-1280 to NASH. Your affiant knows this number to be related to NICHOLE. TORION stated he placed a call to "the fat one." Your affiant believes this to be Rashaud "Fat Man" BETHANY. TORION again instructed NASH to contact NICHOLE.

116. On the same date, TORION placed a call to NICHOLE at approximately 4:05P.M. NICHOLE stated she was contacted by NASH. NICHOLE stated she wanted to wait "a couple of weeks" for NASH. TORION advised NICHOLE he will be back and be "back on the same program real soon." TORION expressed a hope to get his "power tools" from the vehicle involved with his arrest.

117. On the same date, TORION placed a call to FRANKLIN JR at approximately 4:21P.M. TORION stated NASH will make sure "Sota straight" and TORION asked FRANKLIN JR to make sure things make it "up there." TORION also expressed a need to make money. TORION asked to speak with "Lil bro." a male identified as "Al" began talking on the phone after a short wait. The subject "Al" stated he was going to get to Minnesota with BRITT. "Al" provided the number 262-205-9773. "Al" stated if he could not find a ride to Minnesota, he would take the bus. TORION explained to take the bus to "her city" and "she" will "hold the business down."

37

118.     On the same date, TORION placed a call to Rosales at approximately 5:05P.M. TORION explained he does not want Rosales to bond him out of jail for a situation TORION "chose." Rosales suggested TORION should have purchased a plane ticket and visited her in Arizona. TORION stated it was his plan after he was done "taking care of business."

119.     On the same date, TORION placed a call to NICHOLE at approximately 6:30P.M.  TORION explained to NICHOLE, TORION will "set it up" with NASH, and have FRANKLIN JR travel to a Burger King, by bus and "get it together." Your affiant knows the Greyhound bus stop in Albert Lea, MN to be a Burger King located at 2011 E. Main St, Albert Lea, MN, 56007. TORION instructed NICHOLE to advise FRANKLIN JR of the city for travel. NICHOLE described the plan as "nice."

120.     On the same date, TORION placed a call to FRANKLIN JR at approximately 6:47P.M. TORION requested a call be made to the phone number 773-688-8306. During the call, and individual identified as "Dave" was called by FRANKLIN JR. TORION stated he was on his way to Milwaukee, WI when he was arrested. TORION explained NICHOLE will instruct FRANKLIN JR on where to go. Your affiant believes this to be a reference to the travel plans discussed in the previous call with NICHOLE.

121.     Through cellphone record data and other investigation, Affiant was able to verify that telephone numbers **773-426-3316 (TARGET PHONE 1)** and **616-329-5328.  (TARGET PHONE 2)** are associated with Jermaine C. "Rocko" Nash.

122.     On March 14, 2024, TORION placed a call to the phone number 773-426-3316 (**TARGET PHONE 1**). SA Lowrance knows this phone number to be related to Jermaine C. "Rocko" NASH. The call was answered by a male who stated he was in "Cali". Your affiant knows "Cali" to mean California. It should be noted, BROOKS later identified an individual as

38

"Rocko" being in California in a phone call with Nichole BROOKS on March 15, 2024. During the call, TORION explains to NASH he will have "C Wife" contact NASH. Your affiant believes this to be Nichole BROOKS.

123.    On March 15, 2024, TORION placed a call to the phone number 920-808-5445. The call was answered by a female voice, your affiant recognized from previous calls as Nichole BROOKS. TORION explained to NICHOLE, NASH is in "L.A.". Your affiant believes this to be Los Angeles, California. TORION further explained NASH to have "a few thousand for me." Your affiant believes this to mean money. TORION stated the money will be given to NICHOLE. NICHOLE stated she attempted to call NASH on March 14, 2024, on behalf of Cortez BROOKS, but the call was not answered.

124.    Your affiant further located a phone number related to NASH of **616-329-5328** (**TARGET PHONE 2**). This number was found by your affiant to be registered in CashApp to the account display name "Rocko" and the CashTag $bigbossrocko1. Your affiant knows through individuals will utilize CashApp to accept payment for narcotics, firearms, firearms parts and accessories, and other items.

125.    On March 21, 2024, your affiant met with Will County Illinois probation. NASH is known to be on probation for charges from a Will County, IL case. Will County Probation provided the phone number for NASH of **Target Phone 1: 773-426-3316** as their number to make contact with NASH.

126.    Through the investigation, Affiant knows that co-conspirators are using telephone and cellphones to conduct criminal activity. Affiant also know that Apple can search for iCloud accounts using cellphone numbers. Affiant also knows that iCloud accounts store, among other information, call, text, location, and photo history.

39

## CONCLUSION

127.    Torion BROOKS continues to communicate with Nichole BROOKS and Jermaine C. NASH.  NASH used **TARGET PHONE 1** to communicate with Nichole BROOKS, Torion BROOKS and others for fraud, narcotics, and illegal firearms activity, and the location data that will be obtained from this warrant will be used by law enforcement to obtain location information for NASH that will assist in identifying Nash's residences, coconspirators, and other locations where his illegal activities are being conducted.  NASH also used **TARGET PHONE 2** for CashApp which your affiant knows individuals will utilize CashApp for payment in the above activities.

## CELLSITE DATA

128.    Based on my training and experience, I know that T-Mobile (collectively, the "Service Provider") can collect cell-site data on a prospective basis about the Target Cell Phone. Based on my training and experience, I know that for each communication a cellular device makes, its wireless service provider can typically determine: (1) the date and time of the communication; (2) the telephone numbers involved, if any; (3) the cell tower to which the customer connected at the beginning of the communication; (4) the cell tower to which the customer was connected at the end of the communication; and (5) the duration of the communication. I also know that wireless providers such as the Service Provider typically collect and retain cell-site data pertaining to cellular devices to which they provide service in their normal course of business in order to use this information for various business-related purposes.

## E-911 Phase II / GPS Location Data

129.    I know that some providers of cellular telephone service have technical capabilities that allow them to collect and generate E-911 Phase II data, also known as GPS data

or latitude-longitude data. E-911 Phase II data provides relatively precise location information about the cellular telephone itself, either via GPS tracking technology built into the phone or by triangulating on the device's signal using data from several of the provider's cell towers. As discussed above, cell-site data identifies the "cell towers" (i.e., antenna towers covering specific geographic areas) that received a radio signal from the cellular telephone and, in some cases, the "sector" (i.e., faces of the towers) to which the telephone connected. These towers are often a half-mile or more apart, even in urban areas, and can be 10 or more miles apart in rural areas. Furthermore, the tower closest to a wireless device does not necessarily serve every call made to or from that device. Accordingly, cell-site data is typically less precise that E-911 Phase II data. Based on my training and experience, I know that the Service Provider can collect E-911 Phase II data about the location of the Target Cell Phone, including by initiating a signal to determine the location of the Target Cell Phone on the Service Provider's network or with such other reference points as may be reasonably available.

**Pen-Trap Data**

130.    Based on my training and experience, I know each cellular device has one or more unique identifiers embedded inside it. Depending on the cellular network and the device, the embedded unique identifiers for a cellular device could take several different forms, including an Electronic Serial Number ("ESN"), a Mobile Electronic Identity Number ("MEIN"), a Mobile Identification Number ("MIN"), a Subscriber Identity Module ("SIM"), a Mobile Subscriber Integrated Services Digital Network Number ("MSISDN"), an International Mobile Subscriber Identifier ("IMSI"), or an International Mobile Equipment Identity ("IMEI"). The unique identifiers – as transmitted from a cellular device to a cellular antenna or tower – can

41

be recorded by pen-trap devices and indicate the identity of the cellular device making the communication without revealing the communication's content.

### Subscriber Information

131.   Based on my training and experience, I know that wireless providers such as the Service Provider typically collect and retain information about their subscribers in their normal course of business. This information can include basic personal information about the subscriber, such as name and address, and the method(s) of payment (such as credit card account number) provided by the subscriber to pay for wireless communication service. I also know that wireless providers such as the Service Provider typically collect and retain information about their subscribers' use of the wireless service, such as records about calls or other communications sent or received by a particular device and other transactional records, in their normal course of business. In my training and experience, this information may constitute evidence of the crimes under investigation because the information can be used to identify the Target Cell Phone's user or users and may assist in the identification of co-conspirators and/or victims.

### AUTHORIZATION REQUEST

132.   Based on the foregoing, I request that the Court issue the proposed warrant, pursuant to 18 U.S.C. § 2703(c) and Federal Rule of Criminal Procedure 41.

133.   I further request that the Court direct the Service Provider to disclose to the government any information described in Section I of Attachment B that is within its possession, custody, or control.

134.   I also request that the Court direct the Service Provider to furnish the government all information, facilities, and technical assistance necessary to accomplish the collection of the information described in Attachment B unobtrusively and with a minimum of interference with

the Service Provider's services, including by initiating a signal to determine the location of the Target Cell Phone on the Service Provider's network or with such other reference points as may be reasonably available, and at such intervals and times directed by the government. The government shall reasonably compensate the Service Provider for reasonable expenses incurred in furnishing such facilities or assistance.

135. I further request, pursuant to 18 U.S.C. § 3103a(b) and Federal Rule of Criminal Procedure 41(f)(3), that the Court authorize the officer executing the warrant to delay notice until 30 days after the collection authorized by the warrant has been completed. There is reasonable cause to believe that providing immediate notification of the warrant may have an adverse result, as defined in 18 U.S.C. § 2705. Providing immediate notice to the subscriber or user of the Target Cell Phone would seriously jeopardize the ongoing investigation, as such a disclosure would give that person an opportunity to destroy evidence, change patterns of behavior, notify confederates, and flee from prosecution. *See* 18 U.S.C. § 3103a(b)(1). As further specified in Attachment B, which is incorporated into the warrant, the proposed search warrant does not authorize the seizure of any tangible property. *See* 18 U.S.C. § 3103a(b)(2). Moreover, to the extent that the warrant authorizes the seizure of any wire or electronic communication (as defined in 18 U.S.C. § 2510) or any stored wire or electronic information, there is reasonable necessity for the seizure for the reasons set forth above. *See* 18 U.S.C. § 3103a(b)(2).

136. Because the warrant will be served on the Service Provider, who will then compile the requested records at a time convenient to it, reasonable cause exists to permit the execution of the requested warrant at any time in the day or night. I further request that the Court authorize execution of the warrant at any time of day or night, owing to the potential need to locate the Target Cell Phone outside of daytime hours.

43

## ATTACHMENT A

### Property to Be Searched

Records and information associated with the following cellular devices assigned call numbers (referred to herein and in Attachment B as the "Target Cell Phone"): **Target Phone 1: (773) 426-3316, Target Phone 2: (616) 329-5328**, whose service provider is T-Mobile, a wireless telephone service provider headquartered in Parsippany, NJ.

# ATTACHMENT B

## Particular Things to be Seized

### I.     Information to be Disclosed by the Provider

To the extent that the information described in Attachment A is within the possession, custody, or control of the Provider, including any information that has been deleted but is still available to the Provider or that has been preserved pursuant to a request made under 18 U.S.C. § 2703(f), the Provider is required to disclose to the government the following information pertaining to the Account listed in Attachment A:

a.     The following subscriber and historical information about the customers or subscribers associated with the **Target Phone 1**, and **Target Phone 2** for the time period October 1, 2020, to the present:

    i.     Names (including subscriber names, usernames, and screen names);

    ii.     Addresses (including mailing addresses, residential addresses, business addresses, and e-mail addresses);

    iii.     Local and long-distance telephone connection records;

    iv.     Records of session times and durations, and the temporarily assigned network addresses (such as Internet Protocol ("IP") addresses) associated with those sessions;

    v.     Length of service (including start date) and types of service utilized;

    vi.     Telephone or instrument numbers (including MAC addresses, Electronic Serial Numbers ("ESN"), Mobile Electronic Identity Numbers ("MEIN"), Mobile Equipment Identifier ("MEID"); Mobile Identification Number ("MIN"), Subscriber Identity Modules ("SIM"), Mobile Subscriber

Integrated Services Digital Network Number ("MSISDN"); International Mobile Subscriber Identity Identifiers ("IMSI"), or International Mobile Equipment Identities ("IMEI");

vii. Other subscriber numbers or identities (including the registration Internet Protocol ("IP") address); and

viii. Means and source of payment for such service (including any credit card or bank account number) and billing records; and

ix. All records and other information (not including the contents of communications) relating to wire and electronic communications sent or received by Target Cell Phone 1 for the period of January 1, 2022, to the present including:

   a. the date and time of the communication, the method of the communication, and the source and destination of the communication (such as the source and destination telephone numbers (call detail records), email addresses, and IP addresses); and

   b. information regarding the cell tower and antenna face (also known as "sectors" through which the communications were sent and received) as well as per-call measurement data (also known as "real-time tool" or "RTT").

b. Information associated with each communication to and from Target Cell Phone 1 and 2, for a period of 30 days from the date of this warrant, including:

   i. Any unique identifiers associated with the cellular device, including ESN, MEIN, MSISDN, IMSI, SIM, or MIN;

2

ii.    Source and destination telephone numbers;

iii.    Date, time, and duration of communication; and

iv.    All data about the cell towers (i.e. antenna towers covering specific geographic areas) and sectors (i.e. faces of the towers) to which Target Cell Phone 1 will connect at the beginning and end of each communication as well as per-call measurement data (also known as "real-time tool" or "RTT").

c.    Information about the location of Target Cell Phone 1 and 2 for a period of 30 days during all times of day and night. "Information about the location of the Target Phone" includes all available E-911 Phase II data, GPS data, latitude-longitude data, and other precise location information.

i.    To the extent that the information described in the previous paragraph (hereinafter, "Location Information") is within the possession, custody, or control of the Provider, the Provider is required to disclose the Location Information to the government. In addition, the Provider must furnish the government all information, facilities, and technical assistance necessary to accomplish the collection of the Location Information unobtrusively and with a minimum of interference with the Provider's services, including by initiating a signal to determine the location of Target Cell Phone 1 on the Provider's network or with such other reference points as may be reasonably available, and at such intervals and times directed by the government. The government shall compensate the Provider for reasonable expenses incurred in furnishing such facilities or assistance.

3

ii.      This warrant does not authorize the seizure of any tangible property. In approving this warrant, the Court finds reasonable necessity for the seizure of the Location Information. *See* 18 U.S.C. § 3103a(b)(2).

## II.    Information to be Seized by the Government

All information described above in Section I that will assist in the investigation of Torion R. BROOKS, and others regarding violations of 18 U.S.C. § 922(a)(1)(A) (engaging in a firearms business without a license); 18 U.S.C. § 922(g)(1) (unlawful possession of firearms and ammunition); 18 U.S.C. § 922(d)(10) (sale of a firearm to a person who intends to use it for a felony or a drug trafficking crime); 18 U.S.C. § 933 (trafficking firearms); 18 U.S.C. § 924(c) (possession of a firearm in furtherance of crime of violence or drug trafficking crime); 18 U.S. Code § 1029 (Fraud and related activity in connection with access devices); 18 U.S. Code § 1028A (Aggravated identity theft); 18 U.S.C. § 371 (conspiracy); 18 U.S.C. § 1341 (mail fraud); and 21 U.S.C. 841 (illegal drug distribution), are being committed or will be committed by Torion R. BROOKS, Nichole BROOKS, Jermaine C. NASH and others.

Law enforcement personnel (who may include, in addition to law enforcement officers and agents, attorneys for the government, attorney support staff, agency personnel assisting the government in this investigation, and outside technical experts under government control) are authorized to review the records produced by the Provider to locate the things particularly described in these Warrants.

## CERTIFICATE OF AUTHENTICITY OF DOMESTIC RECORDS PURSUANT TO FEDERAL RULES OF EVIDENCE 902(11) AND 902(13)

I, _____, attest, under penalties of perjury by the laws of the United States of America pursuant to 28 U.S.C. § 1746, that the information contained in this certification is true and correct. I am employed by **T-Mobile/Metro PCS** ,and my title is _____. I am qualified to authenticate the records attached hereto because I am familiar with how the records were created, managed, stored, and retrieved. I state that the records attached hereto are true duplicates of the original records in the custody of T-Mobile/Metro PCS The attached records consist of _____ **[GENERALLY DESCRIBE RECORDS (pages/CDs/megabytes)]**. I further state that:

      a.  all records attached to this certificate were made at or near the time of the occurrence of the matter set forth by, or from information transmitted by, a person with knowledge of those matters, they were kept in the ordinary course of the regularly conducted business activity of T-Mobile/Metro PCS and they were made by **T-Mobile/Metro PCS**

      b.  as a regular practice; and

      c.  such records were generated by **T-Mobile/Metro PCS** electronic process or system that produces an accurate result, to wit:

      1.     the records were copied from electronic device(s), storage medium(s), or file(s) in the custody of **T-Mobile/Metro PCS** in a manner to ensure that they are true duplicates of the original records; and

      2.     the process or system is regularly verified by **T-Mobile/Metro PCS**, and at all times pertinent to the records certified here the process and system functioned properly and normally.

I further state that this certification is intended to satisfy Rules 902(11) and 902(13) of the Federal Rules of Evidence.

_____     _____
Date                                Signature

5